**PHILLIPS et al. v. CHAMBERS, Ex'r, et al.**

No. 23847.   Oct. 29, 1935.

408

Gaylord R. Wilcox, Dudley B. Madden, and Walter Hubbell, for plaintiffs in error (except Verna Roselutis).

Sylvester Grim and Orville Grim, for plaintiff in error Verna Roselutis.

Foyd L. Jackson, County Atty., J. Berry King, Atty. Gen., Fred Hansen, Asst. Atty. Gen., J. C. Norman, and M. J. Northcutt, for defendants in error.

BUSBY, J. This is a contest between Cotton county, Okla., and the alleged heirs of Nathaniel L. Glessner, deceased, to determine the validity of a testamentary devise, whereby the deceased gave or attempted to give a large portion of his property to the county for the "purpose of supporting and maintaining the aged and poor" of that county. If the county prevails, the intent of the testator will be carried out. If the heirs prevail, their personal fortunes will be enhanced. The crown of victory must reward the efforts of the side whose claim is most firm'y based upon the principles of law and equity which must govern our decision.

Nathaniel L. Glessner died on March 30, 1930, owning real estate and personal property situated in Cotton county and of the approximate value of $30,000. His will had been executed on March 12, 1930. It provided:

"Last Will and Testament of Nathaniel L. Glessner. I, Nathaniel L. Glessner, of Walters, Cotton County, State of Oklahoma, being now in good health, strength of body and mind, but sensible of the uncertainty of life, and desiring to make disposition of my property and affairs while in health and strength, do hereby make, publish and declare the following to be my last will and testament, hereby revoking and cancelling all other former wills by me at any time made.

"1. I direct the payment of all my just debts and funeral expenses.

"2. I give and devise to my brother John E. Glessner, Fifty Dollars.

"I give and devise to my brother George H. Glessner, Fifty Dollars.

"I give and devise to my half brother Jacob E. York, Fifty Dollars.

"I give and devise to my sister Susan S. Phillips, Fifty Dollars.

"I give and devise to Bernie Roselutis $50.00.

"I give and devise to the daughter of my deceased brother Theodore F. Glessner (whose name I do not know) $5.00.

"I give and devise to Ethel K. Snyder $5.00.

"I give and devise to James Murphy $5.00.

"3. I hereby direct that my three brothers and one sister mentioned above have the income and proceeds of all my property so long as they, or either of them shall live, said proceeds and income to be distributed to them annually and in equal shares but they are not to have possession of any of my property.

"4. I give, devise and bequeath all the rest and residue of my property, both real and personal, to Cotton County, Oklahoma, for the sole and only purpose of supporting and maintaining the aged and poor and making for them a home and comfort in their declining days.

"5. I direct that the County Commissioners of Cotton County, Oklahoma, take charge of said property when my three brothers and one sister above mentioned shall have died, they to manage all property, erect buildings, and other things in connection therewith as seems best to them in making the dependent aged and poor of Cotton County, Oklahoma, comfortable in their declining years.

" (Page one, Nathaniel L. Glessner will)

"6. I hereby appoint R. A. Chambers, of Walters, Oklahoma, as the sole Executor of this my last will and testament and direct that while my brothers and sister live and are entitled to the proceeds and income of my property that he do all that is necessary toward keeping the improvements on said property in good repair and condition. * * *"

On June 9, 1930, after a contest in the county court of Cotton county, in which the parties to this proceeding participated, the will was admitted to probate.

On the 23rd day of June, 1930, this action was commenced in the district court of Cotton county by Susan S. Phillips, John A. Glessner, George H. Glessner, Jacob F. York, Ethelyn K. Snyder, and James Murphy, as plaintiffs, against R. A. Chambers, executor of the estate of Nathaniel L. Glessner, deceased, the board of county commissioners of the county of Cotton, state of Oklahoma, Verna Roselutis, and the unknown heirs of Theodore F. Glessner, deceased.

The plaintiffs, who are, respectively, in the order named above, a sister, two brothers, a half brother, a niece and a nephew, assert that they are the sole surviving heirs at law of the deceased. They seek a construction of the will and a judicial declaration of the invalidity thereof, in so far as the same purports to attempt to devise and bequeath property to Cotton county.

On the 20th day of October, 1930, the defendant Bernie Roselutis, who alleges that that she is one and the same person as Verna Roselius, filed her answer and cross-petition in this action in which she alleges that she is the daughter of Nathaniel L. Glessner, deceased, and his sole and only heir. She also seeks a construction of the will and a judicial determination of its invalidity.

The executor and the county, seeking to uphold the will in its entirety, joined issues with the plaintiffs and the cross-petitioner by appropriate pleadings.

The cause was tried to the court without the intervention of a jury and resulted in a judgment for the county sustaining the will and the validity of its various provisions. The judgment was entered on January 3, 1932.

All the asserted heirs at law appear herein as plaintiffs in error and join in their efforts to procure a reversal of the trial court's judgment. Since the effect of the decision of the court below was to prevent any of the plaintiffs in error from receiving any portion of the estate as heirs, their adversity of interest is not involved in this appeal. The executor and the county, through its board of commissioners, appear herein as defendants in error. The parties will be referred to in this opinion in the order of their appearance in this court or as the heirs and the county, respectively.

In presenting their case to this court the heirs group their arguments under four propositions, which are stated as follows:

"One. A county cannot take by devise, either absolutely or in trust, property to be held and maintained as a poor farm for the following reasons: * * * (Asserted reasons omitted for present.)

"Two. This device to the county in trust for the use of the aged and poor is illegal and void, for reasons as follows: * * * (Asserted reasons omitted for present.)

"Three. This devise to the county for the aged and poor, is unlawful, for reason that it contravenes the law against perpetuities.

"Four. The trust sought to be created by this devise being unlawful, the estate descends to the heirs of the testator under the statutes regulating descent and distribution."

In their brief the heirs say they deem the question presented by the third proposition to be the "pivotal issue in this case." We shall therefore consider it first.

As the basis of their contention they assert that by the terms of the will "it was the intention of the testator to vest an estate in land in perpetuity in the county as trustee." For the purpose of discussing the point under consideration, we shall accept the construction thus urged.

The purpose of this trust which is said to violate the rule against perpetuities is charitable, since the property of the deceased is by the terms of the will to be used "for the sole and only purpose of supporting

and maintaining the aged and poor" of Cotton county. While no previous decision of this court has been called to our attention declaring such a purpose to be charitable, the decisions from other jurisdictions are in accord on the subject. Treadwell v. Beebe et al., 107 Kan. 31, 190 P. 768, 10 A. L. R. 1359. (See, also, numerous cases mentioned in the annotations in 14 L. R. A. [N. S.] 49, and 10 A. L. R. 1368.) A "charitable trust" has been defined as "any trust coming within the definition of a legal charity for the benefit of an indefinite class of persons sufficiently designated to indicate the intention of the donor and constituting some portion or class of the public." 5 R. C. L. 294. In 5 R. C. L. 291, the meaning of charity is thus stated:

"Probably the most comprehensive and carefully drawn definition of a charity that has ever been formulated is that it is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature."

The purpose of the questioned devise contained in the will is obviously charitable under the universally accepted meaning of the term.

The county urges, in opposition to the contention of the heirs and in support of the judgment of the trial court, that the rule against perpetuities does not apply to "property devised and held for charitable purposes."

Strictly speaking, the term "rule against perpetuities" refers to the creation of future estates which may not vest within a certain prescribed limitation of time, generally fixed as the period of the lives of those in being and 21 years. 21 R. C. L. 282; see, also, sections 11759 and 11756, O. S. 1931. It does not, according to some authorities, include the rule against the suspension of the power of alienation. 21 R. C. L. 284; The Rule Against Perpetuities, Gray (3d Ed.) par. 591. However, the term is not usually employed in the strict sense, but is broadly used to include any one or all of the following restrictive rules: "The rule against the remoteness of vesting of contingent interests," "the common-law rule against re-

straints on alienation," "the statutory rules against undue suspension of the power of alienation," or "the rule against postponing the direct enjoyment of property." Trusts and Trustees, Bogert (1935) vol. 2, page 1164, par. 341.

Considering the various phases of the rule against perpetuities in their relation to the case now before us, it is apparent that we are not here concerned with the rule against the remoteness of vesting of the estate in the trustee for charitable purposes, since the estate, under any construction of the will, vests by the provisions of the devise at the termination of the lives of persons now in being, namely, the brothers and sisters. Nor do we understand that the heirs are contending that this particular phase of the rule is violated by the will. Their contention is centered around the rules against restraints on alienation. They assert that when the property passes to the county as trustee for the use of the aged and poor, it will thereafter be inalienable in perpetuity. Such is the nature of a charitable trust, which, as in this case, does not ordinarily have any definite cestui que trust and which is therefore inalienable because there is no one to alienate it. Gray, Rule Against Perpetuities (3rd Ed.) p. 472, par. 590. This statement as to the inalienability of the res of charitable trusts is made advisedly and without consideration of the frequently recognized power of the courts and the Legislature to remove or break the restraints against alienation of the property vested in such trusts. Jones v. Habersham, 107 U. S. 174, 2 S. Ct. 336, 27 L. Ed. 401; Delaware Land & Development Co. v. First Central Presbyterian Church, 16 Del. Ch. 410, 147 A. 165; Rolfe & Rumford Asylum v. Lefebre, 69 N. H. 238, 45 A. 1087; Trustees of First Presbyterian Church of Town of Salem v. Wheeer, 106 N. J. Eq. 8, 149 A. 589. We are not now concerned with the propriety or possibility of exercising the suggested power nor with the necessity of the application of such power, and will refrain from expressing our views until such time as the question is directly presented in connection with the administration of a charitable trust. (See, generally, Bogert, Trusts and Trustees, vol. 2, ch. 20, dealing with the administration of charitable trusts.) The assumption of the existence of the power of courts or the Legislature to break a restraint on alienation admits the pre-existence of such a restraint and we may therefore, for the purpose of testing the validity of the charitable trust herein involved, assume the inalienability

of the trust res, particularly the real estate left by the decedent.

This brings us to the narrow question: Do the rules against restraint on alienation apply to charitable trusts in this jurisdiction? The question is one of first impression in this court, but it has been a subject of prolific litigation and exhaustive discussion in other jurisdictions.

It has been general'y said that the ru'e against perpetuities, referring to the rule against restraints on alienation, does not apply to charitable trusts. Thompson on the Construction of Wills, at page 755, sec. 588; 48 C. J. 986, par. 78. However, the general conclusion thus stated is not without exception and cannot be accepted without an examination of the reasons upon which it is based. Thus some states, notably New York, at an early date (Levy v. Levy, 33 N. Y. 97; Holland v. Alcock [N. Y.] 16 N. E. 305; Michigan [Trustees v. Clark, 3 N. W. 207] and Minnesota (Little v. Willford, 17 N. W. 282), have declared the rules against perpetuities and restraints on alienation applicable to all express trusts, whether private or charitable. Thus charitable trusts have been dec'ared invalid in those jurisdictions if they operated to restrain alienation of property beyond the statutory limitation period. The theory of the decisions mentioned seems to be that since the statutes of those states forbidding restraints on alienation do not expressly except charitab'e trusts from their operation, they should be deemed to include them. They also reason that the common law, which is by each recognized as a part of its jurisprudence, does not save charitable trusts from the operation of the rule.

This latter conclusion is announced on the theory that charitable trusts were good in England only by virtue of the Statute of 43 Eliz., sometimes known as the Statute of Charitab'e Uses, and were not good at common law, combined with the theory that the statutes of each of the respective states last above mentioned contain a comp'ete, comprehensive, and exclusive substituted system of laws superseding the system of charitable uses previously existing. It was pointed out in this connection that the organization of charitable corporations was authorized, to which corporations benevolently disposed individuals could will their property. The effect of those decisions is to concede that the benevolent purpose of a testator cou'd be accomplished by willing his property in fee to a charitable corporation authorized to receive the same, but that his intent must be thwarted because of the manner chosen for its accomplishment.

The heirs assert the similarity of our statutes to those of the states whose decisions we have just mentioned and urge that we should follow them. They concede, however, that the views urged are not in accord with the decisions in 41 of the other states of the Union, but contend that the decisions in a great many of those states should be distinguished by reason of differences in prevailing statutes.

Perpetuities are condemned by our Constitution. Section 32, art. 2, Okla. Const. The remote vesting of estates and restraint upon alienation thereof beyond limited periods are forbidden by our statutes. Sections 11756, 11758, and 11759, O. S. 1931. Trusts in re'ation to real property, except as authorized by statute, are forbidden. Sections 11803 and 11821, O. S. 1931. Express trusts are authorized (section 11820, O. S. 1931), but their duration is limited. Section 11821, O. S. 1931. The suspension of the power to alienate the subject-matter of a trust other than the power to exchange or sell for the purpose of reinvestment constitutes a suspension of the power of alienation. Section 11758, O. S. 1931.

Likewise benevolent corporations are authorized and may receive gifts of property, devised by will. Sections 9950 and 9951, O. S. 1931.

The foregoing constitutional and statutory provisions forbidding restraints on alienation neither expressly except charitable trusts from their operation nor expressly refer to such trusts as falling within the inhibitions stated. They are si'ent on the question of whether charitable trusts are intended to be affected thereby. However, section 2, O. S. 1931, provides:

"The common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma: but the rule of the common law, that statutes in derogation thereof, shall be strictly construed, shall not be applicable to any general statute of Oklahoma; but all such statutes shall be liberally construed to promote their object."

The question then arises: Does the common law supp'ement the statute law in this jurisdiction to an extent which justifies the judicial approval of a charitable trust? It has been generally held that the purpose of statutory or common-law rules against re-

straints on alienation is to prevent the accumulation of vast private estates by making property in the hands of individuals inalienable. The generally accepted view is that such rules are not applicable to charitable trusts unless expressly made so by statute.

Thus it was decided at an early date in California in construing statutes similar to our own that such statutes did not affect charitable trusts, because no specific reference was made to such trusts. Estate of Hinckley, 58 Cal. 457, at 482:

"What has been said with reference to the object of the common law and statutory rule prohibiting the vesting of legal estates beyond a certain period—the prevention of the dangerous enhancement of the wealth, power and influence of particular individuals and families—applies equally to equitable estates or interests. We must assume that the Legislature had this object in view. We ought not to construe a statute, in which no direct reference is made to so important a subject as charitable trusts, as intended to prohibit charities; against which can be urged none of the objections, so pregnant of evil, which have been made against permanent settlements in families"

—and in discussing the meaning of the word "perpetuities" appearing in the Constitution and its application to charities, it was therein stated:

"In the absence of any legislation adopting the common law, it is probable that the courts of this state would go to the common-law definitions to ascertain the meaning of the expression 'no perpetuities shall be allowed,' as used in the Constitution. However this may be, immediately upon the adoption of the common law, it became necessary to construe the language of the Constitution, as being simply declaratory of the common law rule. The exception 'for eleemosynary purposes' cannot be held to enlarge the meaning of the prohibitory clause which precedes it. The exception seems to have been added lest the words 'no perpetuities shall be allowed' might possible (possibly) be held to include perpetual charities. In a certain sense trusts for charities may be perpetuities, since they are not required to be limited as provided by the rule against perpetuities. But the perpetuities prohibited by the common law did not include trusts for charitable uses. It is a correct exposition of the rule of the common law to declare that by it 'perpetuities are prohibited'; yet no legal mind would receive this as a declaration that trusts for charitable uses, although created to continue beyond the period fixed by the common-law rule, were prohibited. We must suppose that the framers of the Constitution were familiar with the rule. If they had simply declared—'no perpetuities shall be allowed,' the courts would not have

held the prohibition to have extended to charities, because the framers of the Constitution used the words of prohibition in view of the evils which the English courts had sought to correct by the establishment of the rule, and in view of the effect and extent of the rule itself."

Our statutes concerning express trusts and rules against restraints on alienation were adopted from Dakota (see historical notes in connection with statutes cited, supra) and the statutes of North Dakota are still identical, or very similar, to our own. Sections 5313 et seq., and 5287, C. S. N. D. 1913. The Supreme Court of North Dakota, referring to charitable trusts, in the case of Hagen v. Sacrison, etc., 123 N. W. 518, 26 L. R. A. (N. S.) 724, said:

"Such trusts are not within the rule against perpetuities, nor are they affected by, or within the scope of, statutory or constitutional provisions against perpetuities in general."

The North Dakota decision would be somewhat strengthened if the point were more exhaustively treated in the opinion. However, the authorities from other jurisdictions demonstrate that the quotation supra is in accord with the decided weight of authority. There is, however, a diversity of views as to the reasons upon which such charitable trusts are upheld.

A few of the states have statutes which, in substance, re-enact the English Statute of Charitable Uses (43 Eliz.; enacted in 1601). These states are Connecticut, Georgia, Kentucky, and North Carolina. Trusts and Trustees by Bogert (1935) p. 1020, and cases cited in support of the text. See, also, section 5000, Gen. Stat. 1930, Conn.; Georgia Civil Code of 1926, secs. 4603 to 4608; Kentucky Statutes of 1930, secs. 317 to 324; North Carolina Code of 1931, ch. 78, secs. 4033 and 4034.

In some of the last-mentioned states the English Statute of Charitable Uses was held to be in force before the adoption of the statutory provisions above mentioned. See American Colonization Society v. Gartrell. 23 Ga. 448; Gass & Bonta v. Wilhite, 2 Dana (Ky.) 170, 26 Am. Dec. 446; Griffin v. Graham, 8 N. C. 96, 9 Am. Dec. 619.

The state of New York (upon whose early decisions the heirs in this case rely) enacted a statute in 1893 (Laws of 1893, chap. 701) by which charitable trusts were validated and authorized. In this connection the statute referred to, by its express terms, removed the objection to such trusts under which they had formerly been declared invalid on

account of uncertainty of beneficiaries. It makes no mention whatever of removing the objection that such trusts violated the rule against perpetuities, which was also one of the grounds upon which the trusts had been judicially repudiated in that jurisdiction. Notwithstanding the absence of such a provision in the statute, the New York court held that such statute removed the objection that charitable trusts violated the rule against perpetuities. See Allen v. Stevens, 161 N. Y. 122, 55 N. E. 568. Thus by statutory enactment and judicial construction thereof, the state of New York has abandoned the position which the heirs say we should follow in this case.

In Iowa, Illinois, Colorado, Arkansas, Massachusetts, Maine, and Missouri, charitable trusts have been upheld upon the theory that the English Statute of Charitable Uses is in force as a part of the common law in each of those jurisdictions. Bogert, Trusts and Trustees (1935) p. 1019.

In some of those states, as, for instance, Missouri, the English Statute of Charitable Uses was declared a part of the common law by reason of the fact that the statute of the state adopting the common law as supplementary to the legislative enactments incorporated a provision saying, in substance, that the common law and also the statutes of England of general application were a part of the law in that particular jurisdiction. See Chambers et al. v. City of St. Louis, 29 Mo. 543.

The decisions from the last-mentioned group of states are not of direct benefit in this jurisdiction because of the difference in our statute. See section 2. O. S. 1931, quoted supra, and compare the statute of Missouri mentioned above. However, the decisions of those states should not be ignored in the solution of this problem, since it is not at all certain that they would have repudiated charitable trusts had they decided that the English Statute of Charitable Uses was not in force there. In fact, some of them have expressly declared that the validity of charitable trusts did not depend upon the English statute at all, but that such trusts were recognized as valid at common law and could and should be approved, even in the absence of a holding that the Statute of 43 Eliz. was regarded as a part of the adopted law of the state. See Chambers et al. v. City of St. Louis, supra.

In Indiana, Delaware, California, Alabama, New Hampshire, New Jersey, Rhode Island, Vermont, Texas, Oregon, and Washington, the question of whether or not the English Statute of Charitable Uses is a part of the law of the state is regarded as unimportant and immaterial and charitable trusts are upheld. The enforcement thereof is based upon the inherent power of equity over such trusts. See Bogert on Trusts and Trustees (1935) p. 1021.

Similarly, in the District of Columbia, Pennsylvania, Ohio, Tennessee, South Carolina, and Nebraska, the English Statute of Charitable Uses is not regarded as being in force and effect, but charitable trusts are upheld and carried out under the inherent power of the courts of chancery. See Bogert on Trusts and Trustees (1935) p. 1022.

And in Wyoming, Utah, New Mexico, Kansas, Nevada, Florida, Arizona, and North Dakota, charitable trusts are upheld and charitable uses recognized, although the decisions do not discuss the precise reasons which constitute the basis of the conclusion announced. Bogert, p. 1022.

It is to be noted in connection with a survey of the decisions in the various jurisdictions dealing with the questions involved herein that the Supreme Court of the United States, in the early case of Philadelphia Baptist Ass'n v. Hart, 4 Wheat. 1, 4 L. Ed. 499, seems to have entertained the view that charities and charitable trusts were based entirely upon the English Statute of Charitable Uses and could not be justified as a part of the common law independent of that statute. The decisions of Maryland, Virginia, and West Virginia dealing with charitable uses and trusts were moulded by this expression on the part of the United States Supreme Court. Bogert, p. 1023.

In connection with these decisions it may be noted that the Supreme Court of the United States later repudiated the early case of Philadelphia Baptist Ass'n v. Hart, supra, and held that such trusts were not entirely dependent upon the Statute of Charitable Uses (43 Eliz.). See Vidal v. Girard's Ex'rs, 2 How. 127, 11 L. Ed. 205.

The case of Chambers v. City of St. Louis, supra, commends itself as a careful and exhaustive treatment of the question now under consideration, as does the later Missouri case of Hadley v. Forsee, 203 Mo. 418, 101 S. W. 59, 14 L. R. A. (N. S.) 49, and the annotation in connection therewith.

We shall not, however, undertake to exhaustively analyze the various decisions from other jurisdictions cited nor to quote therefrom.

A careful consideration of those cases and the reasoning therein contained convinces us that charitable trusts were recognized and upheld at common law independent of any consideration of the English Statute of Charitable Uses. Vidal v. Girard's Ex'rs, supra; Chambers v. City of St. Louis, supra. Our statute makes the common law supplementary to our legislative enactment (sec. 2, O. S. 1931), and the common law thus brought into this jurisdiction includes that portion of the law which excepted charitable trusts from the application of the rules against restraints on alienation. We also conclude that our statutory rules against restraints on alienation and dealing with the purposes for which express trusts can be created and the duration thereof have reference to restraints on alienation of property vested in private individuals or corporations and to the duration of private, as distinguished from charitable, trusts. Estate of Hinckley, supra. We further conclude that the word "perpetuities," as used in our Constitution (sec. 32 of art. 2), was employed in accord with its commonly accepted legal meaning and did not include nor refer to restraints against alienation of property vested in a trustee for charitable purposes. Estate of Hinckley, supra; Hagen v. Sacrison, supra. These conclusions, we believe, are in accord with the better reasoned cases from other jurisdictions.

In further conclusion on this point we deem it appropriate to mention that the subject-matter of our decision is entirely within the control of the legislative branch of government, and should charitable trusts ever grow to such an extent in this jurisdiction that they become a menace to good government and the welfare of society, the Legislature may well correct and prevent their future and further creation. It is much better that if such correction be necessary, the same be accomplished by legislative enactment, which is prospective in its operation, than by judicial decision, which is retroactive in effect.

The will will be upheld as against the principal contention of the heirs.

Their remaining propositions are equally unavailable. We shall treat collectively the first and second propositions, as previously stated in this opinion. Under those propositions it is urged in substance that a county cannot accept a devise or bequest in trust for charitable purposes, nor administer such a trust, and that property owners are not authorized by statute to will property to a county.

The question of whether or not a county of this state can act as trustee of a charitable trust has not previously been considered by this court. A county is one of those political subdivisions of the state which is classified as a municipality. Territory v. Hopkins, 9 Okla. 133, 59 P. 976. In those jurisdictions in which the question has arisen, it has been generally held that a county, as well as any other political subdivision of the state constituting a corporate entity, may act as the trustee of a charitable trust where the purpose to be accomplished by the trust is consistent with the purpose of the organization and incidental to the objects for which the municipal corporation was created.

The rule is stated in 5 R. C. L. page 320, par. 41, in the following language:

"A municipal corporation may act as trustee of a charitable trust where the trust created is germane to the purpose for which the corporation was called into being, and when the administration of the trust, and the liabilities it imposes, are not foreign to the objects for which the corporation was instituted"

—and in the same work, at pages 321-2 of vol. 5, the following appropriate and applicable statement is found:

"A county may act as the trustee of a charitable trust if the purposes of the trust are germane to the objects of the incorporation. If they relate to matters which will promote and aid and perfect these objects, there can be no legal impediment to the corporation's taking a devise upon trust. Thus a county may act as the trustee of a charitable trust created for educational purposes, or for the establishment of a home for orphans, or for the erection of a courthouse for public use."

Nor is it essential that the county, to assume such a duty or to receive a gift of real estate consistent with its corporate purposes, be expressly authorized by statute to do so. In 19 R. C. L. at pages 770-1, with reference to municipal corporations, it is said:

"So also a municipal corporation has an implied power to receive a gift of real estate for any corporate purpose."

The foregoing quotations from R. C. L. were expressly approved by the Kansas court in the case of Treadwell v. Beebe et al., 107 Kan. 31, 190 P. 768, 10 A. L. R. 1359, in which case the Kansas court upheld the power of a municipality to accept the bequest of a trust fund and administer it in perpetuity for a public charitable use. The annotation in connection with that case, beginning at page 1368 of 10 A. L. R., reviews

a multitude of cases dealing with the subject and demonstrates the general prevalence of the rules as above stated.

In dealing with the question of whether the relief of the poor is a public purpose, it was said in Treadwell v. Beebe, supra:

"The relief of the poor of a city is certainly a proper concern under its corporate duty to provide for the general welfare of the municipality. Food, fuel, clothing, and shelter are the primary essentials of existence within the Kansas parallels of latitude, and if a city cannot concern itself with the relief of the poor, or with the administration of relief provided by a charitably disposed philanthropist to the deserving poor, in the matter of distributing food and fuel, then all the long journey which organized society has traveled from the days of the cave man comes to naught, and our boasted humanitarianism is but a pretense and a humbug. Public purpose! There are no public purposes impressed on a civilized community so important as to see to it that deserving persons in its midst do not suffer from hunger and cold."

In this jurisdiction there can be little doubt but what the relief of the aged and poor within a county is one of the purposes for which the counties of this state are organized. Our Constitution provides in section 1 of art. 17 that:

"Each county in this state, now or hereafter organized, shall be a body politic and corporate."

And by section 3 of art. 17 that:

"The several counties of the state shall provide, as may be prescribed by law, for those inhabitants who, by reason of age, infirmity, or misfortune, may have claims upon the sympathy and aid of the county."

Section 7542, O. S. 1931, reads:

"The county commissioners of the several counties of the state of Oklahoma shall be overseers of the poor for their respective counties, and shall perform all the duties with reference to the poor of their said counties that may be prescribed by law."

And section 7543, O. S. 1931, provides:

"The overseers of the poor in each county shall have the oversight and care of all the poor persons in their county so long as they remain a county charge, and shall see that they are properly relieved and taken care of in the manner provided by law."

Section 7544, O. S. 1931, also contains the following provision:

"Every county shall relieve and support all poor and indigent persons lawfully settled therein, whenever they shall actually need assistance, and shall allow such temporary relief to persons not settled therein as shall be actually necessary pending the ascertainment of his or her legal settlement and removal thereto."

It is thus apparent that the purpose of the charitable trust involved in the will under discussion is not only consistent with the purpose of the organization of counties of this state, but is in strict accord with the duties imposed upon them by constitutional provision. It is apparent from the foregoing authorities that we must uphold the charitable trust and the power of the county commissioners to administer the trust, unless we find in our statutes some provision which expressly or by necessary implication prohibits the county from receiving the property in trust or carrying out such trust in substantial compliance with the requirements of the will. In this connection the heirs call our attention to section 8213, C. O. S. 1921 (sec. 7544, O. S. 1931), by which a limitation is placed upon the value of homes that may be established for the care of the poor, and it is urged in that connection that the value of the property in this case may exceed the limitation thus imposed by statute.

We do not conceive it to have been the purpose of the Legislature in enacting the statute to have intended the imposition of a limitation upon the amount of property which the county could receive by gift or devise for the purpose mentioned. The obvious and apparent purpose of the statute was to place a limitation upon the expenditure of public funds and to prevent the counties from spending in excess of a limited amount for that purpose without a vote of the people. The statute invoked has no application to this case.

Our attention is also directed by the heirs to section 11225, C. O. S. 1921 (sec. 1540, O. S. 1931), which provides in substance that no corporation can take under a will unless expressly authorized to do so by its charter or by statute. It is to be observed in connection with this statutory provision, however, that municipal corporations are not mentioned therein. The word "corporation," as used in the statute, is not intended to include counties. The statute must be construed in connection with section 7361, O. S. 1931, relating to the general powers of counties. That section of our law provides:

"Each organized county within the state shall be a body corporate and politic, and as such shall be empowered for the following purposes: * * *

"Second. To purchase and hold real and

personal estate for the use of the county, and lands sold for taxes as provided by law."

The power to purchase and hold real estate as conferred by this statute is broad enough to authorize the receipt thereof by devise or gift. The Kansas court had this identical question before it in the case of Treadwel v. Beebe, supra, wherein their statute authorized cities **to purchase and hold** real and personal property. In disposing of the question the court said:

"Gen. Stat. 1915, sec. 1748. The city is authorized to purchase and hold real and personal property for the use of the city, and the word 'purchase' has been held to mean the acquisition of title to property by any mode except by inheritance. Delaney v. Salina, 34 Kan. 532, 539, 9 P. 271. It has been held that a city may accept and administer a fund in perpetuity for the purpose of maintaining a public park (Schnack v. Larned, 106 Kan. 177, 186 P. 1012), and for the purpose of prospecting for and developing a coal mine (Delaney v. Salina, supra). In the Salina Case, the present contention was made and answered: 'It is claimed that it is not within the power of a city to accept or receive property as a devise, bequest, or legacy, or for any such purpose as that which is designated in the present will. We do not think that this point is sound or well taken.'"

After a careful consideration of the various statutory provisions of this state, we conclude that there is nothing in law to prevent one who is benevolently inclined from wi'ling his property to one of the counties of this state, either in fee or in trust, for charitab'e purposes, so long as the purpose of the devise is consistent with the general purposes for which the county was organized and created. The care of the aged and poor of a county is one of the express purposes of its existence, both by constitutional and statutory provision. The benevolence of the testator in this case has the effect of relieving the county in part of the burden of carrying out this purpose of its existence. We therefore, in harmony with the views expressed with practical unanimity in other jurisdictions, hold that the deceased in this case properly made the aged and poor of Cotton county the objects of his charity, and that in selecting the county as the instrumentality through which to accomplish his purpose, no law of this state was violated nor was any statutory or constitutional inhibition overridden.

There is no merit whatever in the contention that the beneficiaries of the trust are not sufficiently designated. Indefiniteness of beneficiaries is the very essence of a charitab'e trust, and it is only essential that the beneficiaries be described in general terms with sufficient certainty to identify the class of persons which is the object of the charity. See 5 R. C. L. p. 309, par. 24. The class of persons is so clearly designated in the will now before us that it is entirely unnecessary to discuss the refinements of the rule in connection therewith.

Owing to the views that we entertain in connection with the first three propositions urged by the heirs, it is unnecessary to consider the fourth. The judgment of the trial court, being in accord with the views herein expressed, is affirmed.

McNEILL, C. J., and RILEY, CORN, and GIBSON. JJ., concur.